You may approach the rostrum. At this time, Your Honor, I would request to reserve five minutes of my time. You may. Again, Your Honor, my name is Eric Edwards. I'm appearing on behalf of the appellant dual Stanford Fritts. I am a member of the Kentucky Bar. I've been practicing some 15 years, but I would ask that you excuse my nervousness some here today as it is my first appearance. That's okay. For a panel of the Sixth Circuit. No problem. Just proceed. All right. Thank you, Your Honor. We're a friendly group. On a nice snowy day. It's good. Good to see smiles. I want to start out, and I will start out by saying first, some of the issues may be tied together, but I'm going to try to go through the issues with the court in order as they were presented in the brief and discuss and try to add some additional points to those. So let's start first with Mr. The first issue that Mr. Fritts raises on appeal was the fact that the United States Supreme Court has not raised a denial of a motion for a new trial based upon his indication that there was a napping juror. In fact, more than one juror. That's the first issue that was raised. Mr. Fritts contends that the district court abused its discretion by denying his motion without the benefit of an evidentiary hearing. And essentially summarily stripped him of the opportunity to meet the burden which is placed upon the defendant. The defendant carries the burden both of establishing the misconduct of the juror as well as establishing some prejudicial effect to the defense. Without the evidentiary hearing, Mr. Fritts' contention is that he was stripped of the ability to further establish and meet his burdens as required under the standing case law. And this is a situation unlike some of the cases like Kennedy, which is cited by the United States in its response brief where jurors were sleeping during the reading of jury instructions. That is a situation where it is curative through deliberations. The jurors are able to read. Those instructions are provided to them. They're able to discuss the instructions with their fellow jurors and make sure they understand them because at those points the court doesn't provide any guidance regarding the instructions. They are read. This is a situation where the affidavit of Ms. Fritts, which was the mother of the defendant in this case at trial, who indicated that it was post-trial, to me as trial counsel, that she had observed two different jurors sleeping during two different critical stages of the proceedings. There's no indication that anyone else in the courtroom observed any jurors sleeping. This was not raised at any point by counsel, by any other juror, by the judge, and apparently not by the affiant before the conclusion of trial. That is correct, Your Honor. As I indicated, I was trial counsel as well, and I did not observe what was indicated to me, and no one else did raise the issue during trial. So is it your position that Mr. Fritts has just an absolute right to an evidentiary hearing? I mean, the case law does not, seems not to indicate that. That's correct, Your Honor. The case law does not indicate that. I don't think it's just a blanket right to the hearing, but I think the issue raised by the motion with the affidavit was a clear indication that what was observed by the affiant was at critical stages, both in the cross-examination of some of the governmental witnesses as well as the direct testimony of the defendant himself, which I would remind the court is a person who has a right to remain silent but chose to forego that and testify because of the seriousness of the charges and what he wanted the jury to know. And for a juror to fall asleep during that testimony is very critical. And I think... May I interrupt and ask? I agree for a juror to fall asleep during critical points may be of great substantial harm to your client if it happened as your affiant has said, but I'd like you to tell us this. We know that some tests can be applied in different orders, but you've agreed that your client has the burden of proving misconduct and the prejudicial effect of that misconduct, correct? Correct. Let's talk about the threshold analysis. Would you disagree that if there is no falling asleep, napping by one or more jurors, that there would be no need even for the determination of prejudicial effect? And then even the greater issue, no need for an evidentiary hearing? If I understand your Honor's question, my response is yes. You have to establish the misconduct first. That's hurdle A. If you don't get over hurdle A, you don't get to B, which is a prejudicial effect. And to echo what Apollia said and Judge Cole has summarized, the judge didn't notice sleeping. No court personnel noticed sleeping. No other jurors noticed sleeping. Even your affiant didn't bring this to your attention until post-trial. It appears that your client has failed to meet the threshold issue or threshold element. I'm not agreeing that the timing of it negates the ability to meet the threshold. Well, let's talk about the timing. Then let's talk about the fact that the judge, who is remarkably observant during trial, no other jurors, no attorney, even Mr. Fritt's attorney, if I recall, didn't observe sleeping. Am I correct? That's correct. I was his attorney during the course of trial. No other jurors. So how do you balance that against the threshold? I think that's why there's an importance for the evidentiary hearing. We have an affiant who says this, swearing under oath that this is what they observed. Putting that person before the judge, questioning that person more in detail regarding what they saw, when they saw it, exactly the stages that they believe or the witnesses that they observed this would further allow the court to gauge. I think you're getting to a credibility of the affiant. If no one else saw it, is this person telling the truth or are they saying this to assist her son, who is the defendant? But I think that without the questioning and bringing that in, basically the court made a decision, this woman, the affiant, is not telling the truth and I don't want to hear any more about it, I'm denying the motion. So I don't think it was provided the opportunity to present and address that affiant regarding what she saw. Thank you. You're welcome. You may want to move on to some of your other issues. Okay. I think I will skip, given the time here, to the third issue that was raised on Mr. Fritt's behalf and that was the sentencing issue regarding the pill count determination. Initially I want to state that throughout the sentencing we did not object to methodology that was used by the United States Probation Office, which was an averaging system, but to the number and really to the reliability of the information that was utilized in there. As this court, I'm sure, is well aware, the sentencing guidelines at section 6A, 1.3A contains a policy statement which indicates that sentencing courts are permitted to rely on relevant information without regard to admissibility under rules of evidence, provided that information has sufficient indicia of reliability to support its probable accuracy. And that's the heart of the argument here that Mr. Fritt is raising, is the reliability of the information that was utilized to calculate the pill count, which ultimately results in the offense level calculation for him, was so unreliable. The information came from one particular witness, lay witness, who indicated that he sold to Mr. Fritt's sometimes one, sometimes two, sometimes 10, sometimes 20, sometimes 30 oxycodone pills. He could not give a specific number on any specific time. Sometimes they were 15 milligram oxycodone. Sometimes they were 30 milligram oxycodone in questioning. He could not give specifics on that. But his reliability really comes into question because this witness testified that he had done this over a three-year period, one year of which, by his testimony at trial, was following Mr. Fritt's arrest on the underlying charges. Is it the reliability of the testimony or the credibility of the witness that you're attacking? Well, I think when you're using his numbers and his time frames to calculate this, that was the basis, as indicated in the pre-sentence report, they relied upon his testimony. So his credibility comes into play, which makes his information, the reliability of the information he's providing questionable when you're using those numbers. And it looks like I'm out of time already. Well, you don't have your full rebuttal time unless you'd like to use some of that time now. If I could finish this argument, it would probably take me about a minute. That's fine. Some additional questions, and then I'll maintain the rest of the rebuttal time. This is a situation where, as I indicated, he testified that this occurred for a three-year period of time, one year of which was after Mr. Fritt's was arrested. Was there objection to this testimony? There was not. It was brought out in cross-examination purposefully to deal with his credibility with the jury. And then there was an objection to sentencing. All right. At the sentencing, there was an objection to sentencing on the basis of his testimony. Yes. Okay. And it's interesting that the time frames that were testified to by the witness were not utilized by the probation office. They did not find them reliable and actually cut down the three years that the witness testified to to 22 months, which was the time when Mr. Fritt's was released from jail until the time that he was arrested on the underlying charge here. They utilized a 22-month period. So his information that he provided regarding the timing was unreliable, but yet the information that he provided regarding the number of appeals and the frequency of that, even by his own statements that he couldn't give specific numbers, was utilized and considered reliable by the probation office and subsequently adopted by the court. You have to convince us that the sentencing judge's use of this information was clear error? Yes, Your Honor. Okay. All right. Okay. Thank you. We reserve the rest of your time for rebuttal. Thank you. Good morning. Good morning. May it please the court, my name is Brielle Bovee on behalf of the United States. Mr. Fritts first alleges that the district court erred by denying him the right to an evidentiary hearing. The district court did not abuse its discretion by denying Mr. Fritts his request for an evidentiary hearing prior to ruling on his of juror misconduct. The district court judge, who is in the best position to determine the nature of any alleged misconduct, did not observe any sleeping jurors. The district court has a duty to ensure that each party receives a fair trial. In doing so, they constantly monitor the jury to make sure they're fulfilling their duties as a member of the jury. This includes not sleeping during the trial. The judge is located at the bench, which is an elevated seat position, which allows him to have an unobstructed view of the entire courtroom, specifically the jury box. Given the fact that the judge has an obligation to ensure a fair trial, as well as his seat position in the courtroom where he has the ability to watch the jury, the judge in this case would have noticed had there been any sleeping jurors. Isn't it true that if trial court judges were infallible, if indeed the elevated seat allowed the trial court judge to observe everything in the courtroom, that would eliminate a great part of the docket on case reports such as this? Trial court judges, no matter how well-intentioned, no matter how determined to administer fairly a trial, sometimes miss things. In this case, there was an affidavit. It wasn't just a statement. It was a sworn statement. Perhaps there should have been an evidentiary hearing. What's your best argument against not permitting that limited due process? In this case, it wasn't just the district court judge that didn't notice any sleeping jurors. It was also the courtroom personnel. The district court judge usually watches the jury, as well as the courtroom security officers and the deputy marshal all have eyes on the jury. Yet none of them noticed any sleeping jurors. No jurors reported any sleeping jurors. And finally, the trial attorneys didn't notice or report any sleeping jurors. Therefore, in this case, there was other eyes on the jury outside of just this district court judge. In this case, there were many eyes on the jury, in fact, and no one noticed any sleeping jurors outside Mr. Fritz's own mother, who, like any mother, only wants what's best for her son. The district court has the discretion to determine what type of investigation is necessary into an allegation of juror misconduct. An evidentiary hearing isn't always required. The district court has the ability to craft its own procedures to determine the nature of any juror misconduct, as well as whether it had a prejudicial effect on the defendant. In the case where there's an allegation of a sleeping juror, the district court is allowed to rely on observations as a form of investigation. And that's exactly what this court did. The district court, in this case, relied on its own observations, as well as a lack of reports by others, that there was no sleeping jurors during this trial. This case is similar to Freedig, where the Court of Appeals found that the district court didn't abuse its discretion by failing to inquire into an inattentiveness of a juror, especially since the judge didn't notice any extensive sleeping problems. In this case, there would be little to no benefit, actually, to holding an evidentiary hearing, because the judge, the courtroom personnel, and the trial attorneys didn't notice any sleeping jurors, as well as the fact that the jurors would be prohibited from testifying at an evidentiary hearing under Federal Rule of Evidence 606B. Deference should be given to the district court judge in his determination not to hold an evidentiary hearing, because if it weren't, any time a defendant was unhappy with the verdict, they would raise an allegation of a sleeping juror, and therefore an evidentiary hearing would need to be held. This would put great strain on the judicial system, as well as the finality of the jury's verdict. In this case, an evidentiary hearing wasn't necessary to determine whether there was a sleeping juror had a prejudicial effect on Mr. Fritz's right to a fair trial, because he presented no credible evidence that jurors missed a large or critical portion of the trial. If this were the case, someone other than his own mother would have noticed this sleeping juror. Mr. Fritz's vague and general assertions are therefore insufficient to prove that this alleged juror misconduct had a prejudicial effect on his case. This is similar to a tyranny where the district court did not err by finding that there was no prejudicial effect where the defendant asserted general assertions that jurors slept through parts of the critical presentation of the defendant's evidence, as well as the cross-examination of the witnesses for the prosecution. For these reasons, Mr. Fritz's request for an evidentiary hearing should be denied, and the district court's denial of Mr. Fritz's motion for a new trial should be upheld. Mr. Fritz next alleges that the district court erred by finding that he distributed 600 pills of oxycodone. There is absolutely no basis to disturb the district court's finding that Mr. Fritz was responsible for distributing 600 pills of oxycodone. The district court, relying on Jack Scott Douglas' testimony, as well as other controlled buys made during a 22-month time period, found that this number to be a very fair estimation of the pills that Mr. Fritz distributed. In fact, the district court judge said that this number could have been a lot higher or it could have been a lot lower. That's why, in fairness, it was calculated where it was. Deference should be given to the district court's reliance on witness testimony. In this case, 600 pills over a 22-month time period equates to less than one pill a day. This is a very fair calculation based on witnesses' testimony at trial. Jack Scott Douglas, Mr. Douglas, testified that he sold pills to Mr. Fritz on a daily basis over a three-year period of time prior to his arrest. Mr. Douglas further stated that he sold one, two, ten, twenty, or thirty pills to Mr. Fritz on this daily basis. Now, some of that period, Mr. Douglas' testimony had to be somewhat inaccurate, as I recall, based upon the fact that Mr. Fritz was incarcerated for some period of time during that three-year period. So this 22-month period is what the window when Mr. Fritz was not incarcerated and when Mr. Douglas says he was selling oxycodone to Mr. Fritz, I take it? That's correct. And in this case, Mr. Douglas' testimony should not be discounted simply because he couldn't recall the exact time period that he sold pills to Mr. Fritz. In Mr. Fritz's sentencing hearing, the district court actually said that it's quite unusual for a witness to know the precise time period that they were selling drugs to the defendant and the exact number of drugs that were sold. Generally, this type of testimony is general and vague. However, Mr. Douglas' 22-month time period is supported by other witness testimony, specifically Jerry Bunch. Jerry Bunch was Mr. Fritz's former employer between 2009 and November 2010. Mr. Bunch testified at trial that he observed Mr. Fritz selling pills at work during this time period. In addition, there's nothing unreasonable about the district court taking the reliable parts of Mr. Douglas' testimony and discounting the unreliable portions of it, and that's exactly what they did in this particular case. Other witness testimony also supports the district court's pill calculation. As I just mentioned, Mr. Bunch testified that Mr. Fritz would sell pills at work during the time of his employment with him. John Cantor testified that he purchased pills from Mr. Fritz on at least three occasions. Jason Davis testified that he purchased three pills from Mr. Fritz during a controlled buy on February 25, 2011. Erin Nelson and Lindsay Rose testified that they purchased 15 pills from Mr. Fritz during a controlled buy on March 4, 2011. Ms. Rose also testified that later that day of the controlled buy, she purchased a pill, and the following day she purchased another pill. Mr. Nelson also testified that he had been purchasing pills from Mr. Fritz prior to the controlled buy when his brother Charles wasn't available. Mr. Fritz's own pill addiction also supports the district court's pill calculation. He stated that he did have a pill addiction, and given this addiction, he would need to be distributing a great number of pills just to maintain his own addiction. The district court's finding that Mr. Fritz was responsible for 600 pills is also very reasonable because it didn't take into account Charles's pill distribution or Mr. Fritz's other suppliers. In this case, Charles was Mr. Fritz's brother and his co-conspirator, and he was found to be responsible for distributing 1,300 pills, yet none of these pills were factored into Mr. Fritz's pill calculation, and they could have been because he was his co-conspirator. Instead, the district court only decided to factor into Mr. Fritz's calculations those pills that were directly attributable to him. Mr. Fritz also testified that he had three total suppliers. However, only one of these suppliers testified at trial. Therefore, these other two suppliers, the number of pills that they provided to Mr. Fritz, weren't taken into this calculation. For all these reasons, the district court's finding that Mr. Fritz was responsible for distributing 600 pills should not be disturbed. Okay. Well, Mr. Fritz also takes exception to the two enhancements, the two-point enhancement and the four-point enhancement. And I guess one question I have is that the government's view that both of these enhancements arise out of essentially the same conduct, I guess it was the sale of the shotgun by a deputy, I believe, to Mr. Fritz's brother, Charles, perhaps. But one is a two-point enhancement for possession of a firearm in connection with a drug offense. What's the drug offense? What's the basis for that enhancement? Is it the gun for drugs, that one sale? That one sale is taken into consideration, as well as the fact that during the timeframe of this conspiracy, Mr. Fritz possessed this firearm, a drug proceed, during this time period of the conspiracy, at a location where drugs were being trafficked, specifically in Mr. Fritz's own residence. Do we know where the gun was located in the residence in terms of the drugs? Does the record reflect whether they were in proximity to one another? Mr. West testified at trial that the gun was—Mr. Fritz stated that the gun was kept at his mother's house. His mother's house was also Mr. Fritz's primary residence. And Mr. West testified that he went into a bedroom, obtained the gun, and brought it out and handed it to him. Now, Mr. Fritz also testified that he kept guns in the trailer of this home. There's also testimony that many controlled buys were done at this location where Mr. Fritz's residence is located. As well, Don Seville, one of the police investigators, testified that individuals commonly knew that drugs were being sold at this location. So it was—many drugs were being sold within very close proximity to where Mr. Fritz possessed this firearm. Many of these drugs, if not most, were being sold by the brother, Charles? In addition to Mr. Fritz. So then you've got the four-point enhancement as well, which is for possession of a firearm in connection with a felony. Is that—how does the offense upon which this guideline applies—is it the same conduct, the same situation? The sale of the shotgun that was being kept at the residence from which drugs were sold? I guess I'm trying to figure out what the difference is in terms of the conduct that gives rise to application of both of these. In this case, as well, it's very similar. The facts for the two-point enhancement also apply to the facts in the four-point enhancement. For the four-point enhancement, Charles' trade of pills with the sheriff in exchange for a firearm was reasonably foreseeable to Mr. Fritz, because Mr. Fritz stated that he knew that Charles was selling pills to the sheriff prior to the trade, as well as he testified that the sheriff showed him this firearm. Therefore, he could foresee that his brother would engage in this transaction. In addition to that transaction, Mr. Fritz also possessed this firearm, a drug proceed at his residence, a location where drug trafficking was occurring during the time period of this drug conspiracy. Therefore, this firearm was connected to Mr. Fritz's drug offenses, specifically the drug conspiracy. So for the 2K2.1B6 enhancement, there's possession of a firearm in connection with a felony. So what is the felony? The drug conspiracy. Just the conspiracy overall? Overall, yes, correct. Okay, thank you. Anything further? No, Your Honors. If you have no further questions, the United States will rest on its brief. Okay, thank you. Mr. Edwards? Thank you, Your Honor. First, I guess I will hit, since the Court raised some questions regarding the enhancements, I'll try to address those first. As it relates to the two-point enhancement under 2D1.1, and listening to the United States' argument, they're hinging this on Dole Fritz's foreseeability that his brother would trade pills for a gun. There's indications, but yet arguing, that he knew his brother was selling pills to the sheriff, but I don't see where that specifically, the fact that I am selling or a person is selling drugs to another person, how that gives rise to foreseeability that there's some likelihood that Mr. Fritz should be aware that his brother might receive a gun in exchange for those pills, as opposed to the money, if that's the course of dealing that they had always had. I thought there was something in the record that Mr. Fritz was least connected with the negotiations to buy the firearm. Is that, am I incorrect about that? That is incorrect, Your Honor. There's a subsequent, that's, we don't know, and that's one of the issues. There was apparently a trade by Charles Fritz, because that's information that was contained in his plea, factual basis, of the gun with the sheriff. Now, Bill Fritz was convicted of possession of a firearm under count four of the indictment before negotiating the sale of a firearm to a third party. It had nothing to do with the trade of the gun with the sheriff. In fact, there's been no evidence that the gun that was sold was actually the same gun that was traded with the sheriff. So, while the court's correct that there was some involvement with setting up a sale of a firearm, it is different from the trade that took place. Doyle Fritz knew that his brother had the shotgun because he made some comment to the fact that I'm a felon in possession and I don't need to be around a gun, or something to that effect. That's correct. He was aware that his brother had this gun and where his brother was selling drugs. I think he knew where the gun came from. The underlying facts of how his brother received the gun, the timing of that gun, is a question. And one thing I want to clear up is, the United States, talking about this gun, was located at Mr. Doyle Fritz' primary residence. That's inaccurate. There's proof put in the record at trial that there's multiple houses on a property there. And Mr. Fritz resided in a different home than where the gun was found. And the gun was not found at any time near any drugs. Not in proximity to, but apparently and presumably was sold during the period of the conspiracy. Your time has expired, but could you take 30 seconds to talk about the four-point enhancement as well? What your claim is in terms of error and that enhancement being applied. Yes. That enhancement applies if the firearm is found in close proximity to drugs, drug manufacturing materials, or drug paraphernalia. I think that that's a key limitation that the sentencing guidelines place on that enhancement. Because there's a lot of factual questions. Even though Mr. Fritz was found to have been in possession of a gun by a jury, the question is, is it the same gun that you're talking about that was traded? Because the reliance is that that gun was connected to a felony offense because the gun was traded for drugs. The timing of that, whether it was actually within the conspiracy, there's insufficient evidence to support that. But there's no nexus between that firearm and the felony for application of the enhancement. Okay. Well, thank you very much, counsel, both of you for your arguments today. We very much appreciate them. The case will be submitted and the clerk may call the next case. Thank you.